IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| ANGELA DIMANTI, | CASE NO. 1:24-CV-01805-DAC |
| Plaintiff, | MAGISTRATE JUDGE DARRELL A. CLAY |
| vs. | **MEMORANDUM OPINION AND ORDER** |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

### INTRODUCTION

Plaintiff Angela Dimanti challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry dated Oct. 17, 2024). The parties then consented to my exercising jurisdiction under 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (ECF #4). For the reasons below, I **AFFIRM** the Commissioner's decision.

### PROCEDURAL BACKGROUND

Ms. Dimanti applied for SSI in January 2022, alleging she became disabled on December 28, 2019 due to a hearing impairment, hyperlipidemia, trigger finger, stage one breast cancer, hypertension, and blindness or low vision. (Tr. 136, 229). The claim was denied initially on April 11, 2022 (Tr. 135) and on reconsideration on July 15, 2022 (Tr. 144).

Ms. Dimanti requested a hearing before an Administrative Law Judge. (*See* Tr. 295). On August 1, 2023, Ms. Dimanti (represented by counsel) and a vocational expert (VE) testified before

an ALJ. (Tr. 94-128). On October 2, 2023, the ALJ determined Ms. Dimanti was not disabled. (Tr. 8-25). On August 22, 2024, the Appeals Council denied Ms. Dimanti's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-7; *see also* 20 C.F.R. § 416.1481). Ms. Dimanti timely filed this action on October 17, 2024. (ECF #1).

## Factual Background

### I.    Personal and Vocational Evidence

Ms. Dimanti was 46 years old on her alleged onset date and 50 years old at the hearing. (*See* Tr. 136). She has a limited education as defined in the Social Security regulations and past work experience as a self-employed house cleaner. (Tr. 99-100).

### II.    Relevant Medical Evidence

**2018.** Ms. Dimanti has a history of kidney stones that required multiple surgical interventions and periods of hospitalization. She was hospitalized for four days in May 2018 and, on June 7, she underwent a cystoscopy, bilateral ureteroscopy, laser lithotripsy, and bilateral stent placement.[1] (Tr. 626). On June 13, at a follow-up appointment with her surgeon, J. Patrick Spirnak, M.D., Ms. Dimanti complained of frequency, urgency, and severe discomfort when voiding. (Tr. 617). Dr. Spirnak removed the stent. (Tr. 617-18). At her next appointment on June 9, Ms. Dimanti denied bladder symptoms. (Tr. 616). In September 2018, Ms. Dimanti presented

---

[1]    Cystoscopy is a surgical procedure used to examine the bladder and urethra. *See Cystoscopy, MedlinePlus,* http://medlineplus.gov/ency/article/003903.html (last accessed July 7, 2025). Ureteroscopy is used to examine the ureters (tubes connecting the kidney to the bladder). *See Ureteroscopy, MedlinePlus,* http://medlineplus.gov/ency/article/007593.html (last accessed July 7, 2025). Laser lithotripsy is a procedure that uses shock waves to break up stones in the kidneys and parts of the ureter. After the procedure, the tiny pieces of stones pass through the urine. Once the stone is broken up, a stent is placed to drain urine until all the small pieces of stone pass. *See Lithotripsy, MedlinePlus,* http://medlineplus.gov/ency/article/007113.html (last accessed July 7, 2025).

at the emergency department with nausea, vomiting, and flank pain. (Tr. 607-08). Dr. Spirnak

diagnosed nephrolithiasis.[2] (Tr. 603). During a cystoscopy procedure, Dr. Spirnak found a large

stone at the ureteropelvic junction of the left kidney and placed a stent. (Tr. 602). On October 4,

Ms. Dimanti underwent lithotripsy and stent replacement. (Tr. 596). On October 10, the stent was

removed. (Tr. 588). The next week, Dr. Spirnak performed lithotripsy on two distal ureter stones

revealed on a follow-up scan. (Tr. 585-87).

**2020.** In January 2020, after an abnormal mammogram and biopsy, Ms. Dimanti was

diagnosed with breast cancer. (Tr. 551). She underwent surgery in February. (*See* Tr. 524). For post-

surgical cancer treatment, Ms. Dimanti's oncologist prescribed Tamoxifen.[3] (Tr. 497). In May, Ms.

Dimanti experienced significant side effects and stopped taking the medication. (*See* Tr. 479). Ms.

Dimanti's kidney stones returned that same month. (Tr. 484-88). Medication made the symptoms

tolerable. (Tr. 484-85). The stones did not progress through the ureter and, on July 7, Dr. Spirnak

performed lithotripsy and placed a stent. (Tr. 460).

In September, Ms. Dimanti's oncologist prescribed letrozole and goserelin.[4] (Tr. 440). With

letrozole, Ms. Dimanti reported hot flashes, diffuse bone pain, body aches, and joint pain, worse

---

[2]     Nephrolithiasis refers to kidney stones. If a kidney stone does not pass on its own, it may
become lodged in the urinary tract, causing extreme pain in the back or side, bloody urine, fever
and chills, vomiting, and burning. *See Kidney Stones, MedlinePlus,* http://medlineplus.gov/
kidneystones.html (last accessed July 7, 2025).

[3]     Tamoxifen is a tablet used for, among other things, reducing the risk of developing
a more serious type of breast cancer in women who have had ductal carcinoma in situ (DCIS) and
who have been treated with surgery and radiation. The medication blocks estrogen activity in the
breast. Common side effects include increased bone or tumor pain, hot flashes, nausea, excessive
tiredness, dizziness, depression, headache, stomach cramps, and constipation. *See Tamoxifen,
MedlinePlus,* http://medlineplus.gov/druginfo/meds/a682414.html (last accessed July 7, 2025).

[4]     Letrozole is a tablet used for, among other things, treatment of breast cancer in women
who have experienced menopause and who have had other treatments such as surgery to remove

with physical activity. (Tr. 424, 429). Tylenol and ibuprofen were ineffective. (Tr. 417). Her

oncologist suggested increasing physical activity and prescribed venlafaxine.[5] (*Id.*).

In December 2020, Ms. Dimanti reported mild but insufficient improvement with

venlafaxine, rating her pain at six out of ten. (Tr. 404). The oncologist prescribed a low dose of

Tramadol to be taken sparingly for the pain. (Tr. 407).

**2021.** In January 2021, she reported continued bone pain and right hip pain. (Tr. 401). In

February, Ms. Dimanti's oncologist referred her to palliative care for management of cancer-related

pain. (Tr. 400). During her palliative-care consultation that month, Ms. Dimanti complained of

significant arthralgia (aching, squeezing, not radicular) that was worse after taking her oral

medications. (Tr. 396). She described being very active with helping to raise and homeschool her

niece and nephew but reported trouble getting up from the floor. (*Id.*). The doctor described the

"difficult nature of treatment using aromatase inhibitors," ordered lab work, and prescribed

duloxetine.[6] (Tr. 399). The doctor also prescribed Tramadol for pain. (Tr. 395).

---

the tumor. It is a nonsteroidal aromatase inhibitor that decreases the amount of estrogen in the
body. The drug is intended to be taken for several years or longer. Common side effects include
hot flushes, night sweats, nausea, vomiting, constipation, stomach pain, muscle, joint, or bone
pain, excessive tiredness, difficulty falling or staying asleep, and swelling in the hands, feet, ankles,
or lower legs. *See Letrozole, MedlinePlus,* http://medlineplus.gov/druginfo/meds/a698004.html (last
accessed July 7, 2025). Goserelin is used in combination with other medications to treat certain
types of breast cancer and works by decreasing certain hormones in the body. *Goserelin Implant,
MedlinePlus,* http://medlineplus.gov/druginfo/meds/a601002.html (last accessed July 7, 2025).
Throughout the relevant period, Ms. Dimanti received monthly injections of goserelin and vitamin
$B_{12}$. (*See, e.g.,* Tr. 369, 382, 390, 401, 403).
     [5]     Venlafaxine, typically used to treat depression, is sometimes used for hot flashes
and in women taking medication to treat breast cancer. *See Venlafaxine, MedlinePlus,*
http://medlineplus.gov/druginfo/meds/a694020.html (last accessed July 7, 2025).
     [6]     Duloxetine, typically used to treat depression and generalized anxiety disorder, is
also used to treat ongoing bone or muscle pain. *See Duloxetine, MedlinePlus,*
http://medlineplus.gov/druginfo/meds/a604030.html (last accessed July 7, 2025).

During a follow-up telehealth appointment with the oncologist in March 2021, Ms. Dimanti complained of continued body aches, poor sleep, and no improvement with duloxetine. (Tr. 392). While receiving her goserelin injection that month, she complained of bone pain that made it difficult to walk long distances. (Tr. 390).

At her next telehealth oncology follow-up in May, Ms. Dimanti complained of continued body aches without improvement using Tramadol and duloxetine. (Tr. 369). Percocet, which was prescribed for post-surgical pain after a breast revision surgery (*see* Tr. 380-82), helped some (*id.*).

On June 3, Ms. Dimanti presented at her primary-care physician's office complaining of right-thumb pain that radiated down the wrist, lasting one month. (Tr. 367). X-ray of the right hand showed pseudo-erosion of the ulnar aspect of the 5th metacarpal base without acute fracture or destructive bone lesion. (Tr. 368). She received a wrist splint, a prescription for 600 milligrams of ibuprofen , and a Ketorolac injection.[7] (*Id.*).

In July, Ms. Dimanti complained of severe hand and forearm pain and was sent for a consultation with a hand surgeon. (Tr. 365). There, she received a Kenalog injection to the flexor tendon sheath of the right thumb.[8] (Tr. 363-64). In September, Ms. Dimanti confirmed her thumb improved with the injection. (Tr. 349).

---

[7]     Ketorolac injection is an NSAID used to treat moderately severe pain. *See Ketorolac Injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a614011.html (last accessed July 7, 2025).

[8]     Triamcinolone injection (Kenalog) is a corticosteroid used to reduce inflammation and treat immune system conditions by changing immune system response. *Triamcinolone Injection*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a625028.html (last accessed July 7, 2025).

During her next telehealth oncology follow-up appointment on August 17, Ms. Dimanti continued to complain of body aches without improvement using Tramadol and duloxetine. (Tr. 359).

On August 20, during an internal medicine visit, Ms. Dimanti complained of urge and stress incontinence, nocturia, leaking with coughing and laughter, and bone pain and diffuse pain with movement as side effects of letrozole. (Tr. 354-55). The treating provider noted her bone pain may be due to "aromatase inhibitor associated musculoskeletal syndrome," for which the main treatment is NSAIDs or Cymbalta as a common alternative. (Tr. 357). The provider advised Ms. Dimanti to discontinue duloxetine, prescribed amitriptyline for her generalized pain, and referred her to a urologist for her urinary symptoms.[9] (*Id.*).

On September 16, Ms. Dimanti attended another palliative-care appointment and complained of continued pain without improvement using medication. (Tr. 353). Michael Harrington, M.D., prescribed meloxicam and pregabalin for pain.[10] (*Id.*). On a follow-up telephone call, Ms. Dimanti reported pregabalin did not help but did not cause side effects and she was getting around a bit better. (Tr. 350). Dr. Harrington increased her dose of pregabalin. (Tr. 351).

At her next follow-up appointment in October, Ms. Dimanti said she was considering medical marijuana for pain. (Tr. 348). Dr. Harrington said that medical marijuana was "not a bad option" and suggested water-walking exercises. (*Id.*).

---

[9]     Amitriptyline is a tricyclic antidepressant prescribed to treat depression. *See Amitriptyline*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682388.html (last accessed July 7, 2025).

[10]     Pregabalin is used to relieve neuropathic pain. It works by decreasing the number of pain signals that are transmitted by damaged nerves. *See Pregabalin*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a605045.html (last accessed July 7, 2025).

In November, Ms. Dimanti reported amitriptyline was not helping and she was not sleeping well. (Tr. 344). Dr. Harrington replaced amitriptyline with nortriptyline.[11] (Tr. 345).

During her follow-up telehealth oncology appointment that month, Ms. Dimanti reported continued body aches and pain. (Tr. 339).

**2022.** In January 2022, the month Ms. Dimanti applied for SSI, she met with Dr. Harrington and described some improvement with nortriptyline. (Tr. 331). She also reported weight gain and left-knee pain. (*Id.*). Dr. Harrington prescribed Topamax to address pain and weight issues. (Tr. 334).

On March 15, Ms. Dimanti reported to Dr. Harrington that she stopped taking Topamax due to central-nervous-system side-effects. (Tr. 1075). Dr. Harrington increased her dose of pregabalin. (Tr. 1078).

During a telehealth follow-up oncology appointment in April, Ms. Dimanti described body aches that sometimes affect her quality of life. (Tr. 1130).

In May, Dr. Harrington again increased Ms. Dimanti's dose of pregabalin. (Tr. 1185). Later that month during a urology appointment for urge and stress incontinence, Ms. Dimanti reported taking ibuprofen, pregabalin, and nortriptyline for diffuse pain and that she remained functional and could care for her family. (Tr. 1178).

In June, Ms. Dimanti was diagnosed with diabetes and prescribed medication. (Tr. 1268). In July, she reported that medical marijuana improved her pain. (Tr. 1251, 1262).

---

[11]     Like amitriptyline, notriptyline is also a tricyclic antidepressant prescribed to treat depression. *See Nortriptyline*, *MedlinePlus*, http://medlineplus.gov/druginfo/meds/a682620.html (last accessed July 7, 2025).

During an August primary-care appointment, Ms. Dimanti described right-hand numbness and urinary urgency. (Tr. 1248). The doctor ordered an EMG to evaluate her hand symptoms and prescribed oxybutynin for urge incontinence. (*Id.*). A nerve-conduction study and an EMG examination, performed together in September, showed mild right-ulnar neuropathy affecting the sensory component, suggestive of a lesion at the elbow, and mild median neuropathy at the right wrist. (Tr. 1310).

During a follow-up telehealth oncology appointment in October, Ms. Dimanti reported that medical marijuana offered great improvement of her generalized pain. (Tr. 1244). In November, Ms. Dimanti attended a primary-care appointment and reported that oxybutynin controlled her stress and urge incontinence but that her generalized bone pain fluctuates in severity. (Tr. 1234).

**2023.** In January 2023, during a follow-up oncology appointment, Ms. Dimanti reported doing well but complained of worsening aches and pain. (Tr. 1225). That same day, she met with Dr. Harrington for a follow-up palliative appointment and reported "doing ok" with medical marijuana and pregabalin. (Tr. 1217).

In March, during a follow-up oncology appointment, Ms. Dimanti reported "doing well" and walking in the warmer weather. (Tr. 1207).

On April 30, Ms. Dimanti presented at the emergency department complaining of nausea, vomiting, and chills. (Tr. 1370). A CT scan showed a 5mm obstructing stone with severe hydronephrosis and inflammatory stranding surrounding the right kidney, left nephrolithiasis, and

an enlarged left ureter.[12] (Tr. 1374). She had severe sepsis from pyelonephritis, causing acute kidney injury.[13] (*Id.*). Before discharge, Ms. Dimanti was assessed by physical and occupational therapists during which she said she drives and does her own shopping. (Tr. 1412). She stated, "I'm used to being very active, I'm always up and around, chasing grandkids, taking them places." (*Id.*). On examination, Ms. Dimanti walked independently for 300 feet. (Tr. 1413). She was discharged on May 3. (*Id.*).

On May 23, Ms. Dimanti returned to Dr. Spirnak for a cystoscopy. (Tr. 1340). During the procedure, Dr. Spirnak removed the right stent and treated two stones. (Tr. 1341). On the left side, Dr. Spirnak found narrowing at the distal ureter. (*Id.*). He decided to reevaluate the left ureter in six weeks and determine the course of treatment. (*Id.*).

On June 20, during a follow-up oncology appointment, Ms. Dimanti reported doing well but not exercising regularly due to joint pain and hot flashes. (Tr. 1521). She endorsed some improvement with pregabalin and described staying active while watching her grandchildren. (*Id.*).

On July 5, during a follow-up urology appointment, Ms. Dimanti denied kidney pain. (Tr. 1760). Noting ureteral stricture on the left side, the doctor ordered imaging tests to determine the extent of the stricture and guide treatment, either with balloon dilation of the ureter or surgical reimplantation. (Tr. 1765).

---

[12]    Hydronephrosis is kidney swelling due to the backup of urine that occurs as the result of conditions such as kidney stones. *See Hydronephrosis of one kidney, MedlinePlus*, http://medlineplus.gov/ency/article/000506.htm (last accessed July 7, 2025).

[13]    Pyelonephritis is a kidney infection. *See Urinary tract infection – adults, MedlinePlus*, http://medlineplus.gov/ency/article/000521.htm (last accessed July 7, 2025).

On July 6, Ms. Dimanti met with Dr. Harrington and reported that medical marijuana helped ease her pain. (Tr. 1512). The next day, during a follow-up surgical oncology appointment, Ms. Dimanti reported "doing well," with tolerable hot flashes and joint pain. (Tr. 1506).

**III.    Relevant Opinion Evidence**

As part of her disability application, Ms. Dimanti was evaluated on March 22, 2022, by neurologist Dariush Saghafi, M.D. (Tr. 945-51). Ms. Dimanti reviewed her cancer history and treatment, stating that the chemotherapy drug makes her bones hurt. (Tr. 945). She described stabbing, shooting pain that occurs suddenly on standing. (*Id.*). On examination, Dr. Saghafi noted "exquisite tenderness to large muscle group compression" of the legs. (Tr. 946). She walked with a slow, small steppage gait in a waddling motion. (Tr. 947). Dr. Saghafi diagnosed Ms. Dimanti with generalized corporeal pain attributed to chemotherapeutic medications and opined that she can lift, push, and pull sufficiently to perform her activities of daily living, lift and carry 23 pounds, and "bend, walk, and stand every 30 feet or sooner depending on the terrain as well as distance overall she needs to cover." (*Id.*).

On April 8, 2022, state agency medical consultant Rannie Amiri, M.D., evaluated Ms. Dimanti's medical records as part of the initial evaluation of her disability application. (Tr. 137-38). Dr. Amiri opined Ms. Dimanti can lift and carry 20 pounds occasionally, 10 pounds frequently; can stand and walk for about six hours each in an eight-hour workday; never climb ladders, ropes or scaffolds; frequently climb ramps and stairs, balance, stoop, kneel, and crouch; occasionally crawl; and must avoid concentrated exposure to noise and all exposure to hazards such as dangerous machinery and unprotected heights. (Tr. 140-41). On July 5, 2022, state agency medical consultant Leon Hughes, M.D., opined Ms. Dimanti required additional hearing

10

limitations on the right side but otherwise affirmed Dr. Amiri's opinions on reconsideration.

(Tr. 148-50).

## IV.    Relevant Testimonial Evidence

Ms. Dimanti was self-employed as a house cleaner before she stopped working in 2012 to

care for her mother. (Tr. 99-100). Her sister-in-law, also a house cleaner, would pass clients to Ms.

Dimanti when she became overwhelmed with work. (Tr. 100). She cleaned "two to three houses a

week" for "a [bunch] of weeks." (*Id.*). She has custody of her autistic niece and nephew. (Tr. 340).

She cannot work because she is in constant pain, with some days better than others. (Tr. 102).

After double mastectomy and breast reconstruction, she lost some arm mobility and cannot reach

behind her back or fully reach her arms overhead. (Tr. 105). Her capacity for overhead reaching is

further diminished when her pain is more severe, typically occurring three to four times a week.

(Tr. 105). She sometimes needs help showering and getting dressed. (Tr. 1121). Her post-surgical

cancer treatments cause generalized bone pain. (Tr. 101). She also has recurring kidney stones with

associated incontinence and leaking, left-knee pain, and hearing deficits. (Tr. 106-09). And she

feels a jolt of pain when standing up and needs to pause to rebalance herself before moving. (Tr.

101). Pain and incontinence disrupt her sleep. (Tr. 111).

Ms. Dimanti takes pregabalin, ibuprofen, and Tylenol for pain. (Tr. 104). She does not

want to use narcotics. (Tr. 1121). She takes a daily pill to relieve kidney symptoms, including

urgency, and wears adult diapers at night. (Tr. 106). She also takes daily chemotherapy pills and

receives monthly injections. (Tr. 115). Her oncologist indicated she will continue that regimen for

a total of five years after which she may receive another combination of medication and injections.

(*Id.*).

Ms. Dimanti lives with her son, daughter-in-law, grandson, niece, and nephew. (Tr. 76). On a typical day, Ms. Dimanti gets the children ready for school, takes her medication, and sits on the couch. (Tr. 1121). She tries to do some housework. (*Id.*). When the children return home, Ms. Dimanti helps with their homework. (*Id.*). When school is not in session, she entertains the children by taking them outside, helping with diamond painting and Legos, and watching videos. (Tr. 110. As she describes it, her energy level is more suited to "building models" than "throwing footballs." (Tr. 116). On good days, Ms. Dimanti can walk two blocks to the playground and watch her niece and nephew play. (Tr. 102). On bad days, she struggles to get off the couch without assistance and takes more breaks during her walk to the playground. (Tr. 102-03).

Ms. Dimanti can sit for 20 minutes before needing to shift positions to relieve pain. (Tr. 103). She cannot stand in one place for any length of time, she must keep moving. (*Id.*). During the children's school programs and conferences, she has needed to stand and walk around. (Tr. 113). She cannot lift more than a gallon of milk, pick up her 3-year-old grandson, or get up from the floor on her own. (Tr. 102, 104, 117). When not in too much pain, she does the dishes and vacuums. (Tr. 109). She sits down to do the dishes and uses a riding cart or leans on the cart when at the grocery store. (Tr. 110, Tr. 1121). Her daughter-in-law does the cooking, though Ms. Dimanti can prepare crockpot meals. (Tr. 110, Tr. 316, Tr. 1121).

The VE testified employers tolerate no more than one absence per month and no more than 20% time off-task during the workday. (Tr. 125).

## V.    Other Relevant Evidence

Ms. Dimanti's daughter-in-law wrote a letter dated April 2023 describing her observations of Ms. Dimanti's condition. (Tr. 315-16). The bottom portion of the first page appears to have

been severed in the scanning process. As best as can be discerned from what remains, Ms. Dimanti and her niece and nephew moved in with her son and daughter-in-law after her double mastectomy because she needed significant help while she healed. (Tr. 315). Though Ms. Dimanti has needed less assistance over time, she struggles with certain daily tasks like brushing and styling her hair. (*Id.*). She is in constant pain and has mobility issues that limit her physical activities, including cooking and cleaning. (Tr. 316). Ms. Dimanti continues to live with them because she requires help caring for herself and her niece and nephew. (*Id.*).

STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts

13

to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Ms. Dimanti had not engaged in substantial gainful activity since January 10, 2022, the application date. (Tr. 89). At Step Two, the ALJ identified the following severe impairments:

> Left breast cancer, status post double mastectomy with breast implants, aromatase inhibitor associated arthralgia, obesity, osteoarthritis left knee, sensorineural hearing loss, pseudo erosion ulnar 5th metacarpal base right hand, and diabetes mellitus.

(Tr. 13-14). At Step Three, the ALJ found Ms. Dimanti's impairments did not meet the requirements of, or were medically equivalent to, a listed impairment. (Tr. 14).

At Step Four, the ALJ determined Ms. Dimanti's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except the claimant can walk 30 minutes at one time; stand 30 minutes at one time; frequently climb ramps and stairs, balance, stoop, kneel, crouch; occasionally crawl; never climb ladders, ropes, and scaffolds. She should never be exposed to unprotected heights and dangerous moving mechanical parts. She can be exposed to a moderate amount of noise, moderate, meaning business offices where typewriters are used, department stores, grocery stores, light traffic, and fast-food restaurants at off-hours.

(Tr. 15). The ALJ then found Ms. Dimanti could not perform her past relevant work as a cleaner.

(Tr. 19). At Step Five the ALJ found Ms. Dimanti could perform other work in the national

economy such as merchandise marker, mail clerk, and office helper. (Tr. 20). Thus, the ALJ

concluded Ms. Dimanti was not disabled. (*Id.*).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the

Commissioner's conclusions absent a determination that the Commissioner has failed to apply the

correct legal standards or has made findings of fact unsupported by substantial evidence in the

record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The Commissioner's

findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v.*

*Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial

evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of*

*Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence

evaluation does not permit a selective reading of the record. Substantiality of evidence must be

based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even

a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in

the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641

(6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the

court does not review the evidence de novo, make credibility determinations, or weigh the

evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if

substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position,

the court cannot overturn "so long as substantial evidence also supports the conclusion reached by

the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## DISCUSSION

Ms. Dimanti asserts she cannot work because her unremitting pain, frequent hospitalizations, and medication side effects would cause her to be absent from work more than once a month. (ECF #7 at PageID 1831). She argues the ALJ erred in assessing her remaining capacity for work when she "failed to consider all the ways in which [her] well-documented cancer caused chronic pain, hospitalizations, and significant side-effects of her medications, all of which significantly limited her functional capacity to sustain substantial gainful activity." (*Id.* at PageID

16

1832). In support, Ms. Dimanti points to her consistent complaints of chronic pain, side effects from cancer treatment, and her prior hospitalizations. (ECF #7 at PageID 1832). Importantly, Ms. Dimanti does not argue the ALJ overlooked any evidence or failed to consider any factors relevant to her functional capacity. Rather, she disagrees with the outcome of the ALJ's analysis.

The Commissioner contends the ALJ adequately explained why and how she determined Ms. Dimanti's allegations of pain and other symptoms were not as limiting as she alleged and the ALJ's conclusions are supported by substantial evidence, including objective findings, reports to treating physicians, her treatment regimen and side effects, and her activities of daily living. (ECF #10 at PageID 1858). I agree with the Commissioner.

Judicial review of a social security appeal is limited to determining whether the ALJ applied the correct legal standards and whether the ALJ's factual conclusions are supported by substantial evidence. *Walters*, 127 F.3d at 528. The reviewing court does not reconsider facts, re-weigh the evidence, resolve conflicts in the evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007).

Ms. Dimanti asks that I do what is prohibited in reviewing a denial of Social Security benefits: reweigh the evidence and decide afresh that she is disabled. Although she argues "all the ways in which [her] well-documented cancer caused chronic pain, hospitalizations, and significant side-effects of her medications, all of which significantly limited her functional capacity to sustain substantial gainful activity," I may not independently determine the facts and declare her disabled. (*See* ECF #7 at PageID 1832). Rather, a reviewing court is limited to the narrow questions whether the ALJ (i) applied the correct legal standards and (ii) supported the factual conclusions with substantial evidence.

Here, the ALJ summarized Ms. Dimanti's subjective complaints about the intensity and persistence of her symptoms and determined they were inconsistent with her reported daily activities, largely normal physical examinations and mild diagnostic findings, and statements she made to her providers. (Tr. 16-18). In making this finding, the ALJ applied the correct legal standard and supported the decision with substantial evidence.

In evaluating the claimant's subjective reports of symptoms, Social Security Ruling (SSR) 16-3p provides that an ALJ must consider the claimant's complaints along with the objective medical evidence, treatment received, daily activities, and other evidence. 2017 WL 5180304, at *5-8 (Oct. 25, 2017). In addition, the ALJ also uses the factors outlined in 20 C.F.R. § 416.929(c)(3) to evaluate the claimant's statements:

1. A claimant's daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief from pain or other symptoms;
6. Any measures other than treatment an individual uses or used to relieve pain or other symptoms; and
7. Any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms.

The ALJ need not analyze all seven factors, only those germane to the alleged symptoms. SSR 16-3p, 2017 WL 5180304, at *8; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 733 (N.D. Ohio 2005).

First, the ALJ noted Ms. Dimanti's subjective complaints:

The claimant alleged disability due to hearing impairment, hyperlipidemia, trigger finger, breast cancer stage 1, hypertension, and blind of low vision. She weighted 250 pounds at 5'6". Per a clarifying call with DDS, she stated her eyes have gotten worse over the last year, but she had not had a recent eye exam, and she reported she can

18

see well enough to drive. She was getting fitted for a hearing aid next month. She had no problems with her speech being understood. She reported trigger finger on her right thumb. She reported bone pain as a side effect from her cancer medication, and she stated sitting down hurts, and when she goes to stand up, she gets a jolt through her body. She walks hunched over for the first 5 minutes and then will eventually walk faster, but she is still in pain. She stated she cannot lift very heavy things. She did not want to use narcotics because she did not want to get addicted.

(Tr. 15).

The ALJ then applied SSR 16-3p and analyzed whether Ms. Dimanti's assertions were consistent with objective medical evidence and the statements she made to her treating providers:

As for the claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms, they are inconsistent because the claimant's hearing loss improved with hearing aid, and diagnostic findings as to the right thumb pain, right knee pain, and right carpal tunnel are all mild. Although the claimant suffered from arthralgias from her aromatase inhibitor, letrozole, she did have improvement with medical marijuana and Lyrica, and although the consultative examiner noted some gait issues, the other medical evidence of record consistently indicates she has a normal gait, normal reflexes and sensation, normal strength in the upper and lower extremities, and normal motor coordination. Recent records note that hot flashes and joint pain are tolerable. She reports she walks when the weather is good, and she takes care of her niece, nephew, and/or grandkids who are very young.

(Tr. 16). The ALJ also noted Ms. Dimanti's daily activities and, as instructed by 20 C.F.R. § 416.920(c)(3)(i), considered whether those activities were consistent with her descriptions of her symptoms:

In terms of daily activities, she reported she has custody of a niece and nephew, and she gets them off to school at 7:30, and then she takes meds and sits down and relaxes. She will get up and try to clean the house throughout the day, cook dinner in the crockpot, and sit down to do the dishes. The kids get home at 3:30, and she sits down to help them with homework, then they have dinner, and the kids take showers. She showers after they go to bed, which takes 45 minutes sometimes. She stated she sometimes needs help getting dressed and putting on a bra because she cannot get her hand behind her back. She stated she drives sometimes but not a lot. She goes grocery shopping with someone, and she will use the cart to lean on or she uses a motorized cart, and she does not put anything heavy into the cart.

(Tr. 18).

In addition, the ALJ considered the effectiveness of her medications and other measures to control her symptoms as instructed by 20 C.F.R. §§ 416.920(c)(3)(iii)-(iv). The ALJ emphasized statements Ms. Dimanti made to her providers during the relevant period, including:

- May 2022: "getting around better";

- July and October 2022: "great improvement" with medical marijuana;

- November 2022: even with diffuse pain she remains functional and can care for her family;

- June 2023: she stays active watching her grandkids; and

- July 2023: her hot flashes and joint pain are tolerable.

(Tr. 17).

The decision illustrates how the ALJ properly applied the legal standards under SSR 16-3p and 20 C.F.R. § 416.920 by evaluating Ms. Dimanti's statements about her daily activities, the effectiveness and side effects of medication used to alleviate her symptoms, and other measures used to relieve pain. The ALJ compared those statements to the evidence of record, including the largely normal physical examinations, the consultative examiner's report, and the state agency medical consultant's prior medical findings, and reasonably concluded Ms. Dimanti's statements of disabling pain are inconsistent with the record. The ALJ substantially supported this conclusion with citations to the medical evidence and Ms. Dimanti's statements to her treating providers.

Although Ms. Dimanti argues her chronic pain from the side effects of medication and her hospitalizations establish disability, the ALJ properly determined that a conclusion of disability was inconsistent with Ms. Dimanti's reported activities, other statements indicating greater ability to function and improvement in symptoms, and objective medical findings. And even if this court accepts that substantial evidence also supports Ms. Dimanti's position, remand remains

20

inappropriate. *See Buxton v. Halter,* 246 F.3d 762, 772 (6th Cir. 2001) ("The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion") (citation omitted).

Ms. Dimanti has not shown the ALJ failed to apply the correct legal standards or that the ALJ did not support the decision with substantial evidence.

## Conclusion

Following review of the arguments presented, the record, and the applicable law, I **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: July 9, 2025

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE